Our first case this morning will be Fox v. Postal Service. Is that correct, gentlemen? Then, Mr. Hendel, you may proceed. Thank you, Your Honors. My name is David Hendel. I'm representing the appellants, Janet and Todd Fox, from the decision of the Postal Service Board of Contractors. We have two separate grounds for appeal, the first issue being perhaps the most important. The first issue is this. The Board failed to consider, analyze, or even mention key evidence relating to what turned out to be the determinative issue in the case. The key issue in the case became whether the excess volumes of mail that Fox received impacted Fox's ability to perform the contract. Mr. Hendel, the difficulty I have in this record is that I see all kinds of allegations or assertions overburdening throughout a period of time, but nothing specific to the days in question. Nothing, no evidence that suggests that on the particular days when the schedule was not met that there was an explanation for it and that explanation might relate to overburdening or something else. I understand that, Your Honor. And you have a difficult burden here because the question is whether there is substantial evidence to support the conclusion. But the problem, Your Honor, is that the Board when it's made that statement in one sentence and cited to one page of the transcript, it neglected to cite to and mention many other pages. I'd like to read some of that to you from which it could have concluded that that applied to all the days. And as a practical matter... Wait. Before you get into reading, and I am interested in hearing the citations, but the way you characterize the legal standard seems to me to be at odds with what we usually do in a substantial evidence case. What you said, if I recall correctly, is that the Board failed to cite other pages from which it could have concluded contrary to the conclusion it reached. There's no obligation for the Board to cite particular pages of the transcript. So when we read a statement such as there was a failure of proof of X, whether there's a citation to one transcript page or 30 transcript pages or none, we are assuming that the Board read the entire record and is basing that judgment on that. So that's point number one. But the second and seems to me more significant point is that when you say other places from which the Board could have inferred a different result from the conclusion that it drew, that isn't the substantial evidence test. You have to show us that the Board necessarily must have drawn that conclusion based on other evidence that you're about to read to us, not simply that it could have. Do you agree with me on that? I'll take on that burden, yes. Okay, fine. But you agree that that's the pertinent burden? I will agree with that, yes. And to answer your first question, I agree they don't have to cite all the testimony, but there is a requirement that they consider all the evidence and there's no evidence that they did. You know, again, there seldom is going to be evidence that the tribunal has considered every piece of evidence that the counsel has pressed upon them. They don't typically say, you know, we've read everything that the lawyer has cited and even then the lawyer can say, well, they really didn't. Or they typically don't put in all the references that you've cited to them. So we typically don't require that kind of evidence. We assume, unless there's evidence to the contrary, that the tribunal has looked at all the evidence that's before it. So I don't know that that, it seems to me, is not a profitable line to pursue. Now, it may be that the evidence will show us that they couldn't really have reached a different result, but not because they didn't, you think, look at all the evidence. Well, Your Honor, even in the case of the Postal Service, never, no one in that case contended that he only kept the truck half full. If we're to accept the conclusion of the board, then that means the truck, which is 170 cubic feet, was one half full. This is at the time when he's complaining, look, I can't take all the mail. It doesn't fit. He's sending correspondence. The Postal Service is watching him like a hawk. If he so much as leaves his car unlocked, he gets written up for a deficiency. If that truck was half full, we had five Postal Service witnesses, certainly they would have said something about it. Mr. Hendel, I understand that we're on overburdening, but I need to deal with something in my own mind here first, and that is the contract itself says, the supplier shall carry all mail tendered for transportation, whatever may be its size and weight, etc. You had to carry all of it. Why is there an overburdening issue? Even the board below held that they were given significantly more mail than contemplated by the contract. It is true that the contract doesn't state... Well, the contract doesn't set a limit on how much mail. It says you will carry all mail tendered for transportation, period. The board below found that 40 cubic feet was essentially the contemplated amount of mail. It says you'll have a truck of 40 cubic feet. I presume if you have to carry all the mail and your truck is only 40, you'd have to make more than one trip, right? That would be an extra trip. Or you'd have to have two trucks. Or actually the 40 cubic feet is a minimum. You'd have a bigger truck. So I'm still trying to figure out why overburdening is an issue at all when you have to carry all the mail regardless. But that's never how those contracts are interpreted. The board below did not interpret that. This would be brand new law. If you think about it, these are people who are delivering mail like a letter carrier. If one day a huge amount of mail shows up, well more than could be contemplated under the sorting time of the schedule or 40 cubic feet capacity, can the contractor be in default because it's not physically able to do it? No one has ever interpreted these contracts that way. The board didn't below. The board agreed with us that there was significantly more mail than contemplated. In those circumstances, what happens in the field... Wouldn't you have to, as the contractor, have provision for that? If that happened, you would have to have someone instantly as a temporary to help you, wouldn't you? Well, typically two things happen. I mean, this is not on the record, but two things typically happen. One is you get an extra shipment and you come back and take the rest of the mail, which the record shows this did happen in prior businesses... Several times, and then the new supervisor didn't allow it to happen. Exactly. So that's what happens. Or the other thing is they just don't deliver it that day, you deliver it the next day. The post service decides. But it's never considered a breach of the contract. I would like to give you... In terms of the contract, just to follow up on Judge Rader's question, on page 63 of the joint appendix talks about the schedule frequency and service requirements of the contract. I'm not sure how to read this, but it looks to me like the contract calls for one trip per day. Is that correct? Yes. It's one trip per day and the vehicle has to carry at least 40 cubic feet. Minimum. That's correct. You can be as big as you need to, but you've got to carry all the mail. Does that mean that if you have a vehicle that is capable of carrying 40 cubic feet, your obligation under the contract is simply to deliver that mail once per day? That's correct. And what happens, this does happen time and again. None of these issues are the same. How can one be over... If you look at the contract that way, how is one overburdened when all the contract requires is that you deliver at least 40 cubic feet of mail and make one trip unless you are authorized to make another trip? That is essentially the requirement. He had a bigger truck. He had a truck that was twice the required capacity of both contracts. But he was delivering two routes. That's true. Each route, if you figure 40 cubic for each, that's 80. 40 plus 40 is 80. His truck was 170 cubic feet. He didn't have any trouble as long as he had two drivers and two trucks. He didn't have any trouble when he was driving it himself for months. The only time he had trouble was during his Christmas period. This happened in... But you have to know Christmas is going to be... Absolutely. ...a heavy time. Your Honor, the contract requirement has never been interpreted the way perhaps you're suggesting. The post office has never interpreted it. The board didn't hold it. The government doesn't even hold deals. But why is... It's the words. I'm trying to figure out what's wrong with my understanding of the words. Because it also has other words. Tell me the other ones that I missed. The specification says 40 cubic feet minimum. So if you have that, you meet that. It has been interpreted time and again that 40 cubic feet means if you have that, you satisfy the contract. And if we give you more mail, you don't have to produce another truck. Keep in mind, these are 40,000-pound contracts. What happens to the extra mail? It just sits there? It gets delivered the next day? Well, typically what happens is... I mean, they usually get this pretty close to being right, so you don't have it all the time. But what happens in that case when there is an overage, when the contractor comes back, they give him an extra trip. Or they give someone else in the office an extra trip, which is what was done in previous years. Because if he couldn't fit it in his truck, or if there was too much mail for some other reason, or if there was late mail, you get an extra trip. That's the preferred way. The second thing would be carried over the next day. And that would apply as well, I take it, to the sorting, the curtailing that occurs. So if you have more than three hours of 15 linear feet of mail, you stop at the point that it's time to leave after you've done the 15 feet, right? That's what you should do. But that's what, you would be in compliance with the contractual obligation if you did that, right? I think so. Sometimes those are adjusted. I mean, it's a practical matter. You might be told to stay longer and do it and get out later. But yes, I think if you, the contract, that's the requirement. Okay. I see I'm running out of time. I just would like to to cite what I think is the key evidence that the board did neglect. If you go to Joint Appendix, page 709, 7 what? 709. Okay. Todd Fox states, due to the volume of mail in the parcels, I couldn't fit them all in the vehicle. And if I had to fit them all in, it could be, you just can't fit them in. You just can't fit them in. During the holiday seasons, there's days that you just can't get them in there. You just can't. But he wasn't obligated under the contract to fit anything more than 40 cubic feet in. Exactly. He's not measuring, the absurdity of the board's decision, as if he could measure what 40 cubic feet was. He was asked at the trial, you know, can you convert linear feet? Because he gets the mail in linear feet, which is like trays. Can you convert linear feet into cubic feet? He couldn't do it. So it's absurd to think that he's out there making a calculation, well what would, of the mail I'm giving, what would 40 cubic feet be? That's absurd to begin with. The second absurdity, if the board's conclusion is upheld, well then he's driving half empty trucks. That's never been the testimony. I can give you other sites, again where he says, I couldn't fit it in. But again, maybe this is getting technical, but this is a technical area. We're dealing with contract enforcement and breach. This, I don't see even that language as responding to the board's statement that he has failed to show that on the days in which he missed dispatch, he had more than 40 cubic feet. It doesn't say that he had more than 40 cubic feet every day, and that having more than 40 cubic feet is what caused him on those days to miss dispatch, right? Is there any place where he says that? You know, the record isn't perfect with you on that? Well why not? Because he should have been asked that exact question, right? I think that's right. And if he had been able to answer that question by saying yes on each of those days, I would require... I think you essentially have that though, Your Honor, with respect to 770. Now, could we have had a better record here? Yeah, we could have had a better record here. But the board didn't even mention these key things, and it didn't cite the key testimony. It cited something that was kind of rambling, and I've cited to you in the brief various things that are much more forceful and impactful... I've read each of the excerpts from the transcript that you cited, but I still don't see any one that hits the nail on the head with respect to what the board regarded as the key issue. I understand, but the board has an obligation to consider it. Well, back to the point that you and I were discussing earlier. Do we infer that the board didn't consider evidence simply because it doesn't cite it? And there is, as I'm sure you know, there's a lot of administrative law standing for the proposition that you don't assume that the agency didn't consider evidence that it doesn't cite. You assume the contrary. I cited you three cases where the Federal Circuit did return on just those things. In the Coughlin construction case, the board's decision wasn't... this court found that the board's decision wasn't supported by substantial evidence because it seemed to ignore important pieces of evidence. Similarly, in the Malloy v. Postal Service case, they sent it back down because the decision didn't show that it considered or analyzed evidence relating to a particular issue. And you have the same thing here. You cannot tell me that this board analyzed those things. You can't do it. And it's just like in those cases. And since the Federal Circuit couldn't find that the board actually analyzed it, it sent it back down. Let's have the board make that decision. Let the board decide. Did those pieces of evidence... would that affect my conclusion or not? And you can't tell from this decision. Mr. Hindell, let's hear from the government We've consumed your rebuttal time, but let's give you that back. And would you give Mr. Harrington an additional five minutes if he needs to use it, and we'll keep the time even? Mr. Harrington. May I please the court? The timely delivery and collection of mail is at the heart of Mrs. Fox's contract with the Postal Service. Now, the board repeated... found that Mrs. Fox repeatedly failed to deliver mail as required by her contract, and therefore affirmed... well, therefore affirmed the termination of the contract for default. Is the obligation under the contract to make anything more than one trip per day? The obligation under the contract is to make one trip per day, and then, if there's additional mail, the management at the Postal Service decides how to handle that. They can do multiple things. They can authorize an additional trip. They can direct an additional trip, they can have someone else at the post office carry the additional mail, or they can say, hold that mail until your route tomorrow. So if an additional trip is not authorized, then the obligation is just one trip? That's correct. Is the obligation to deliver at least 40 cubic feet of mail, or is the obligation to deliver all of the mail that's present that day? Well, the obligation is to deliver the mail that you can deliver based on the equipment that you have provided under the contract. The contract says you will provide a minimum of 40 cubic feet in your equipment. If the contractor said, okay, I'm going to give you something with 50 or 70 cubic feet, and there's additional mail that they can deliver, they would be obligated to use the equipment that they had to the extent that they hadn't. So if the vehicle will hold, say, 80 cubic feet of mail, and there is 200 cubic feet of mail at the post office that day, what is their obligation? To deliver all 200 cubic feet, or just 80 cubic feet, or the 40 cubic feet minimum specified in the contract? Well, if the truck had a capacity of 80 cubic feet... What was the capacity of this truck since he was doing two routes and had a 170 cubic foot truck? Your Honor, the capacity of the truck... The Board didn't address any of this. How are we to know what standard they're holding him to? How does he know what standard he's held to? Well, Your Honor, the Board can be affirmed if you simply say 40 cubic feet because the evidence here, and the key here is, was there substantial evidence for the Board's finding? I mean, we're going... We've been over that and we're aware of the standard, but I'm trying to struggle with any place where the Board specifically told us the standard they were applying and how it was to be construed. I think what the Board talked about was they noted in the decision that there was a minimum requirement for 40 cubic feet. And they said in the decision, they addressed Mr. Fox's argument, and they said that he did not prove that on those days where he did not return in time to meet the dispatch truck, that he was carrying excess volumes of mail. Excess being over 40 cubic feet? Over 40 cubic feet, yes. Which they regarded as excess, I take it, under the contract. They talked about it in those terms. They didn't do an analysis of the contract language. They didn't do an analysis of it. I think they assumed for the sake of argument, accepted for the sake of argument, Mr. Fox's position that 40 cubic feet was what was required to be delivered. Is that 15 linear feet of mail as sorted? No. There is no evidence in the record how you convert linear feet into an actual volume. So we don't have anything to suggest that 15 linear feet or 18 linear feet or 30 linear feet is more than 40 cubic feet. I mean, linear feet talks about basically you've got letters in a row. As opposed to packages. Exactly. It's the packages that will take up the volume in terms of volume. And the contract required you to sort. There is evidence in the record, for instance, that when the successor contractor came on, he said, I'm being delayed because the way he did things was he sorted everything before he started his run, no matter how long that would take. And the Postal Service said, look, you have to start your run on time. If you've got more mail, then you need another sorter. And they basically said, get another sorter in here to do it if you can't sort. Mr. Fox actually did things very differently. He had his sorter sort for three hours whatever the sorter got through. And this is in the board decision. It's in the record. Whatever the sorter got through in that three hours, he then delivered. Now that's important for a couple of reasons. First and foremost, it's important because it shows that the volume of mail itself didn't delay him starting on his delivery. He started the delivery around noon each day. I believe his contract provided for starting the delivery at 1140. And there's no evidence that the volume of mail actually delayed the initiation of the delivery. And so, I mean, that's a significant point because it means volume, at least in terms of sorting, shouldn't have delayed things at all. And there's nothing in the record suggesting that volume should delay the length of time it takes to deliver. It's in fact inherently implausible because the time that you take to drive between mailboxes isn't affected by the volume of mail in the truck. And because the mail had already been sorted, it shouldn't take you any longer to put five letters in the mailbox than it should take you to put ten letters in the mailbox for simply putting in the box. Is there any evidence in the record that specifically addresses the days in question? No. In terms of the burden, the amount to be sorted, or anything of that sort? There is no evidence that ties the number of flats that were received or the volume to specific days. That simply wasn't presented by Mrs. Fox. Well, but we do have evidence that he was sorting 28 to 33 cubic feet. I mean linear feet, which is far beyond the 15 that you could do in three hours. Maybe double it in some instances. Why isn't that substantial evidence? Double the amount of linear feet that he's supposed to be handling. First of all, there's nothing in the contract that suggests that there is any maximum amount in terms of linear feet that you can get. Second of all, what Mr. Fox himself said was that when he would get, say, 20 linear feet of mail and his sorter could only go through 15 linear feet in the three hours for sorting, he curtailed, he didn't deliver the remainder. He took the 15 feet that were sorted, he put that in the truck, and then the rest of it was left for the next day. And that's what the board found. That was one of the specific reasons that the board said, you have not shown us that you actually had to deliver more mail. It was in part because he was unilaterally curtailing the mail. He'd take what he got through during that three hours and he'd deliver that. The other thing that... Yes. This isn't what the board predicated its breach finding on, but what is the Postal Service's position as to whether that was an appropriate response to having too much mail on a particular day? The Postal Service believes that's not an appropriate response. What is the right thing to do? Suppose that on one day effectively more than 15 linear feet of letters and more than 200, let's just pick a number, cubic feet of packages come in. What's he supposed to do? The appropriate thing... Keeping in mind that he better make the dispatch or he's going to be written up. Yes. The thing that he needs to do on that day is get instructions from his supervisor at the Postal Service. Right, and his supervisor is saying, is taking a hard line and saying no extra trips. What then? We have to be careful to distinguish between volume, which may cause the need for additional trips, and simply the linear feet issue, which there's no evidence to suggest that that would cause the need for additional trips. But if you've got... I'm looking at 714 of the record here, and he is saying holiday period each day. So now we don't have an issue of whether or not he's proving it for each day. He's saying each day it was greater than 40 cubic feet, way greater. Yes, it exceeded 40 cubic feet. Now that's three times the amount he's expected to sort. And that's just the letters. Let's assume, as Judge Bryson pointed out, that you've got packages on top of that and keep the proportions the same. That's three times the volumes of packages. And that's tied to each day now. Why isn't that substantial evidence that he was overburdened on your standard of 40 cubic feet a day? Your Honor, the question... He's got three times the amount he's supposed to be. He's testifying to it. Each day, 40 linear feet of letters. That's not even the packages. Why hasn't he just given us substantial evidence that he was overburdened? Well, first of all, let me take a step back and say that the issue is not actually whether or not the route was overburdened. That's not the defense that was presented. But the Board actually found that there were some days in the course of the holiday season where he did get more than 40 cubic feet. But he's testifying to each day, and I presume that's not ever... You said this was at 7.04, Your Honor? At 7.14. 7.14, okay. The volume of mail you were receiving during the holiday period of 07 each day was it equal to 40 cubic feet? No, ma'am, it was greater. I see. He's converted it to cubic feet, actually. Way greater. Your Honor, this colloquy is a little bit confusing in that he must be talking about here not simply the linear feet of mail, but he must be talking about parcels as well. He's talking about cubic feet. I misread that when I first posed the question. But actually, this is even better because we don't have to make the conversion. He's testifying each day over 40 cubic feet. Why isn't that good enough? Well, let me, if I may, step back to what the defense is here. Because the breach that was found was not that he didn't deliver, he was not found in breach because he didn't deliver all the mail that he was presented. If that had been the basis for the termination, then what you're talking about would have a different significance. He was terminated because he did not complete his daily delivery in time to get back it. The dispatcher. He testified that his departure time was delayed because he was overburdened. I don't believe he did testify that his departure time was delayed, Your Honor. There is certainly in the record, and the Board cites it, evidence saying that his practice was to sort the mail he could get through in three hours, take that, take the parcels he could, load up his truck, and deliver it. He didn't delay his departure because of the volumes of mail. And that meant that he should have gotten back in time. What about the fact that it seems to flow logically that if you have more than the allotted amount of mail, it takes you longer to deliver it. So that even if you get out of the dispatch office on time, it's going to take you, say, an extra hour or two to deliver all these packages and so forth. Even if you're the fastest sorter in the world and you throw the packages in the back of the truck, you still miss dispatch because you had too many packages. Well, I think there are a couple of points to make on that, Your Honor. First of all, Mr. Fox never testified that the amount of mail that he actually delivered, the amount that he put into his truck, actually slowed his deliveries down. There's no evidence in the record where he said, the amount of mail I actually put into my truck and delivered slowed me down and that caused me to miss dispatch. Just going back to the defense that really is being presented, Ms. Fox should have had to prove two things. First of all, that she has to deliver more mail than the contract required on those specific days that her driver was late and we've just been talking about that. But there's an additional element to it and that additional element is that the additional volume of mail, rather than the attempt to drive two routes or some other cause, was actually the reason that her driver missed the dispatch truck at the end of the day. As I've said, the volume of mail didn't delay getting started on the route. And the fact is that Mr. Fox was attempting to deliver two routes during the time that he had before coming back to meet the dispatch truck. I think a simple example sort of brings home this particular aspect of the case. And if you assume that Mr. Fox was in the habit of stopping at a coffee shop for three hours every day before he came back to the post office, and then during the Christmas season he repeatedly fails to get back in time to meet the dispatch truck. Now, if Mr. Fox blamed this on the increased volume of mail, it should seem clear that that argument would not fly if he was continuing to stop for three hours at the coffee shop. Well, here we're in basically the same situation. The fact is that he was delivering a second route during the time that he was trying to deliver mail on this route. On contract A-9, the contract at issue here, the mail was to be delivered between 11.40 a.m. and 4.35 p.m., about five hours. And in fact, the contract describes that at JA-102 as the minimum hours necessary to complete the required trip. Then on contract B-3, the second contract that he was attempting to deliver mail on, the mail was to be delivered between 12.00 noon and 3.00 p.m. So there's a total delivery time of three hours. And the Beaufort dispatch truck was supposed to depart at 5.00 each day. It's not surprising under the circumstances that the performance problems resulted. Mr. Fox was attempting to deliver... The board said it was okay that you have one driver. That was not... they said that's not the issue. What the board said was the contract didn't require you to have a dedicated driver, but they said that was not a per se breach, that you didn't have more than one... that you didn't have a driver on each contract. But they said that if you were going to try to drive more than one route, you still had to comply with the performance requirements of the contract. And that's where the breach arose. Now, the fact that it may have flowed from the fact that he was attempting to drive two routes, you know, that's not an excuse, in other words. That's not a defense. Well, that's not what the board said. To go back to Judge Rader's excerpt, his discussion with you about the excerpt on 7.14, what the board says is that... the appellants have not persuaded us that he actually carried more than 40 cubic feet per route on those days in which he missed dispatch. Now, a lot of the evidence is certainly true, doesn't really pinpoint particular days. But this 7.14 does have the reference to each day and does say, reading it together, that he carried 40 cubic feet, or there was at least, more than 40 cubic feet every day during the holiday season. And what we're talking about here, I take it, is the holiday season that he missed dispatch. So why isn't that at least evidence that's contrary to the finding that the board made? Well, the reason this is not contrary to the finding the board made is if you look at the question carefully, it says, it talks about the volume of mail you received during the holiday season of 07. That's different than the volume of mail he was actually delivering. Okay, so you're... Because he curtailed mail. All right, so you're saying that that is taken care of. He should have then added that received and carried, and that would have, you think... Had he added the words and carried, would you agree that that would have been contrary to the finding that the board made on that? If he had added, if Mr. Fox had testified that he had carried more than 40 cubic feet every day, then that would be contrary. That would support his argument. All right. And the reason this is significant is because Mr. Fox himself said that he didn't carry all the mail that he received. He conceded that he curtailed mail deliveries, and that was based on, you know, his sorter would go through the amount, as I've said, and then he would deliver what was actually sorted. So he didn't actually deliver everything that was received. And there are other places in the record that clearly show that he was not actually carrying, not actually attempting to deliver, all of the mail that was presented by the postal service each day. What about, Mr. Hendel has referenced some of our cases, the Court of Claims case as well, that talks about the failure of an agency to address particular evidence. What is your view of those cases? Well, Your Honor, there are... You're familiar with the cases that he cites, aren't you? I am, but I'm also familiar with the cases that this board, where this board has held that... Okay, but how about those cases specifically? Tell me what your take on those cases is. My take on those cases is  Well, of course. And second of all, that for instance, there's one where the question was, did the board consider as part of the Douglas factors the disciplined employees' alleged mental problems? And there really was nothing... Okay, but set aside the MSPB, that's a special case. How about the contract cases? Well, the last one of the three that he cites is the MSPB case. I understand. The second one, I believe, was an unreported opinion, and I do not recall off the top of my head it was a contract case. And then the early court of claims case. I believe basically... Tapper. I believe basically there was no question based on the record there that the issue that was being discussed really wasn't considered by the decision maker. And so, you know, this court has a presumption that the board, the decision maker, considers all evidence that presented. But it's only a presumption, and if there is evidence presented that shows that, that overcomes that presumption, well then, that would be a problem. You have to remember in those two cases what it was that the court regarded  I do not recall off the top of my head, Your Honor. And the court didn't... This was an early case, and I think the law has developed somewhat since then. In 1975, and I guess if you get to my age, that doesn't seem so long ago. Well, the bottom line is the court in that case didn't spell it out in terms of there's a presumption that you consider all evidence. It didn't sort of incorporate all aspects of what the court's law is now. You know, there's the court's Medtronic decision... Mr. Harrington, I think, can you give us your final thought? I certainly can, Your Honor. The bottom line is that here, the board specifically discussed and rejected Mrs. Fox's argument and Mrs. Fox's defense. So there's no question that that argument was in fact before the board, considered before the board. For these reasons, we respectfully request that the board's decision be affirmed. Thank you, Mr. Harrington. Mr. Hendel, you have five minutes. Thank you, Your Honor. I don't really have much to say. I want to point out two things. One would be the question about when he was driving the truck for both routes. The evidence shows he did this in May 2007. There was no problem. It shows, in fact, from October or November through December 15th, there was no problem except for these three days. So even during the busy holiday season, he basically could get it done. So this is... The fact that he was driving both routes is not an issue in this case. He was able to accomplish it. It was demonstrated on the record. I think listening to your arguments and the queries that you've asked today, it seems to me those are the things the board should... Those questions shouldn't have even been asked by this panel. The board decision should have made it clear that it did consider those things. And even those questions that you've asked seems to indicate this has to be sent down for the board to make these findings of fact, not the Federal Circuit to do it. The... I guess I'll close by saying this reminds me of that Sherlock Holmes case in some ways. The case of the... Silver Blaze. You're going to cite Silver Blaze, aren't you? The case where... The dog that didn't bark in the night. And here we have... Maybe that's cited to you all the time. I apologize if that's always cited to you. But the analogy here would be if the board's decision is to be upheld and there was a half-full truck, and just like the dog that didn't bark in the night, there's no evidence of a half-full truck. And with that, I'll conclude. Unless you have any questions. Thank you, Mr. Hindell.